## Robinett's Appeal.    Donnelly's Estate.

Where a daughter, in a proceeding in the Orphans' Court for the settlement of her father's estate, contested the validity of a payment to her husband by the administrator, and the payment was sustained, and a credit therefor allowed, she cannot again, on a settlement of her own account as administratrix of her deceased husband, draw into question the validity of such payment, and claim the amount as her separate property, and not as a part of her deceased husband's estate.

As the law stood in 1839, it was competent for a husband to renounce his interest in his wife's property in favour of a trustee; but such a transaction, if intended as a scheme to defraud his creditors, is void as to them.

The finding of an auditor that such a settlement was fraudulent and void as to the husband's creditors, is conclusive on an appeal.

If an administratrix mix the funds of the estate with her own moneys, and employ both in trade, the parties in interest may, if they prefer it, insist on having a proportionate share of the profits, instead of interest on the amount of trust funds so employed.

The English rule in Chancery upon this subject adopted in Pennsylvania.

An unfaithful trustee will not be allowed commissions.

APPEAL from the Orphans' Court of *Philadelphia.*

This was an appeal by Allin Robinett, surviving partner and assignee of the firm of Robinett, Pollard & Co., from the decree of the court below upon the settlement of the accounts of Catharine Donnelly, administratrix of the estate of Philip C. Donnelly, deceased.

Catharine Donnelly, the accountant, was entitled under the will of her father, John Gavin, deceased, to a share of his estate; and, on the 10th December 1831, her husband, Philip C. Donnelly, being then insolvent, and indebted to the firm of Robinett, Pollard & Co., in the sum of $6801.14, by notes, then running to maturity, conveyed to Thomas Traynor, all his right in his wife's property, derived from her father, in trust for her separate use and her children. This deed recited that he had not intermeddled with his wife's property, and that it was just that it should be secured to her, &c. It was not recorded until the 5th October 1835.

On the 17th December 1831, Philip C. Donnelly made an assignment, to Abner Pollard and Nathaniel Knowles, of certain specific property, in trust for certain creditors, in the order therein mentioned, stipulating for a release within one month. Robinett, Pollard & Co. executed the release on the 31st December 1831; but, having subsequently ascertained that Donnelly had fraudulently concealed a part of his estate, on the 25th September 1835, they commenced suit against him on their original cause of action. The litigation was protracted; during its pro-

gress, Donnelly died, on the 15th July 1841, and letters of administration upon his estate were granted to his widow. On the 12th November 1845, the administratrix was made a party by *scire facias;* on the 5th June 1848, the plaintiffs recovered a verdict for $6401, on which judgment was entered; and on the 3d May 1850, this judgment was affirmed by the Supreme Court.

On the 19th December 1839, the sum of $500 was paid to Philip C. Donnelly, by the executor of John Gavin, deceased, on account of his wife's share of her father's estate. In 1849, after the death of Donnelly, the accounts of Gavin's executor were referred to Joseph A. Clay, Esq., as auditor, before whom Mrs. Catharine Donnelly appeared, and contested the validity of this payment to her husband. The auditor allowed the executor a credit for this payment, and his report was subsequently confirmed by consent.

Philip C. Donnelly died on the 15th July 1841; letters of administration were granted to the accountant on the 16th August following; and, on the 23d, she filed an inventory and appraisement amounting to $2551.50.

The intestate, at the time of his death, and for some time previously, had been engaged in business as a pawnbroker; and the accountant, after his decease, continued the business with the stock and funds belonging to the estate, and carried it on at the same place, precisely as it had been conducted before her husband's death. The profits of this business were proved to have amounted to from $1700 to $2000 per year.

On the 22d January 1848, Allin Robinett cited the administratrix to file her account, which was referred to Samuel H. Perkins, Esq., as auditor; before whom Robinett claimed, among other things, to surcharge her with the $500 received by her deceased husband from John Gavin's executor; and also with the profits of the business carried on with the trust funds. He also contested her claim to commissions.

Mrs. Donnelly was examined before the auditor, and testified as follows, in relation to the $500 paid to her deceased husband:—

"I had property of my own. It was money and property which my parents willed me; it is in my father's will, who died prior to my marriage, but the property did not come into my hands till after my mother's death, who died about seventeen years ago. The property consisted of two houses, and of cash $500, a bond of St. Mary's Church, which was paid off a few months before my husband's death. There was no marriage settlement; my husband never handled this $500. I kept it myself. I had it at his death, and again; I remember no other sums. I had by me but the $500. I had that, a part with the intention of laying it out for my own benefit. I do not remember whether I

received the $500 or my husband. My guardian was dead at the time. I collected the rents of the two houses myself."

On this evidence, the auditor surcharged her with this sum of $500; and, estimating the profits of the business at $1700 per annum, after making her an allowance of $600 per annum for expenses, he also charged her with $1100 per annum as the net profits of the business carried on with the trust fund. And there having been some evidence that the accountant had fabricated spurious claims against the estate, besides misapplying the assets, by employing them in trade, he rejected her claim to commissions. He allowed her counsel fees, and the expenses of the audit, and refused to charge her, as claimed by Robinett, with interest as well as profits. By this report, a balance of $15,266.91 was found to be in the hands of the accountant for distribution.

To this report, exceptions were filed by the accountant, which were sustained, and the following opinion delivered by ALLISON, J.:—

"On the 17th of December 1831, Philip C. Donnelly made an assignment for the benefit of creditors, having, on the 10th of the same month, executed a deed whereby he transferred to Thomas Traynor all his right in his wife's property, in trust, for her separate use and for the use of her children. This deed the auditor decides is void as to creditors, and it is to this finding of the auditor the accountant files her first exception.

"Is the auditor right in deciding that the deed of trust is void as to creditors? We are of opinion that he is not, because the creditors of Philip C. Donnelly had no interest, immediate or remote, in the property of Mrs. Donnelly, which had been converted by the husband to his own use, on the 17th day of December 1831.

"The accountant, by the will of her father, John Gavin, which was executed on the 28th day of May 1824, became entitled to two frame houses on the west side of Fifth street, between Plum and German streets, and to one-half of the remainder of his estate, which consisted of certain pieces of real property, and a bond for $1000, due by the trustees of St. Mary's Church of this city, to the testator. The devise to Catharine Donnelly was subject to the life estate of her mother, who was living on the 17th day of December 1831, when the deed of Traynor was executed, and who continued in full life until the year 1833. This property, therefore, was in no way reduced to possession by Philip C. Donnelly, nor could he, at any time prior to the conveyance to Traynor, have made it his, for whatever right he may have acquired by his marriage with the accountant, it was held in abeyance by, and subject to the intervening life estate of Mrs. Gavin.

"The deed to Traynor recites the purpose intended to be

accomplished by it, and so fully is this made to loom out upon its face, that there has been, and indeed could be, no pretence of an intention, in any way, to conceal or cover up the transaction, it being, in direct terms, affirmed to be a just and equitable disposition of property, which was devised to the accountant by her father, and with which the grantor in the deed had in no way intermeddled; the question, therefore, is freed from all considerations of intentional fraud, which might be inferred from an effort to cover up from creditors the nature of the transaction, and is left to stand solely upon the footing of a legal fraud, in which light the auditor seems to have considered it, and has so decreed, for he assigns as a reason for the conclusion at which he has arrived, the indebtedness of Philip C. Donnelly to Robinett, Pollard & Co., and others, at the date of the execution of the deed.

" Now, what was transferred by the instrument which the auditor regards as a nullity as to the creditors of the grantor?  It cannot be pretended, it was choses in action reduced to possession, for it is apparent that they not only had not, but could not have been converted by Philip C. Donnelly to his own use at that time; for his was but a future contingent right, dependent upon his surviving Mrs. Gavin, the mother of his wife; the conveyance of December 17th 1831, consequently passed nothing more nor less than the contingent right to reduce his wife's choses in action to possession, to his grantee, Thomas Traynor, and it will be seen by an examination of the deed, that nothing more was attempted to be done, for it is *his right* in his wife's property, which is transferred in trust, for her use and for the use of her children.  Marriage operates as a gift to the husband of a wife's personal estate in possession, but is only regarded as a conditional gift of her choses in action, which are in no sense his, until reduced into possession, or until the wife's right is in some other way barred by him (as by an assignment for the benefit of creditors); in such case, if the husband die first, the right survives to the wife.

" The interest of a husband in his wife's lands was held, in Bouslaugh *v.* Bouslaugh, 17 *S. & R.* 363, to be an incident of the marriage contract, as much within his power as the absolute ownership of her chattels, which he could relinquish without the intervention of trustees.  The same principle had also been affirmed in McKennan's Executors *v.* Phillips, at the previous March term of the Supreme Court, and subsequently reported in 6 *Whart.* 571.

" But whatever effect the deed to Traynor may have had upon the interest of Philip C. Donnelly in the lands of his wife, an interest which at the date of the conveyance was not bound by any judgment, lands of which the wife had and could have had no seisin, we think it clear, that as to her choses in action, viewed especially with reference to the $500 with which the auditor has.

[Robinett's Appeal.   Donnelly's Estate.]

surcharged the administratrix, the conveyance effectually passed the right of the grantor to Thomas Traynor.

" A husband may, for the very purpose of preventing the property of the wife being taken and applied to the payment of his debts, refuse to reduce it into possession, renounce his right of dominion over it, or assign, transfer and set over such right for the benefit of any other person, and this he may do, because creditors must have such an interest in the property of their debtor as the law recognises and will protect, a right that can be enforced, to enable them to complain of a disposition of it, adverse to them, or to entitle them to relief as against the act of their debtor.

" The law does not compel a husband to make his wife's choses in action his property; he may say, that it is not his, and he may refuse to do any act that will make it his, and such refusal is consistent with his duty to those to whom he is indebted; for it is the property of the debtor alone that can be taken by the creditors and applied to the payment of their just demands. In Timbers *v.* Katz, 6 *W. & S.* 290, Chief Justice GIBSON designates an interest, such as Philip C. Donnelly possessed in his wife's estate, to be a conditional title only, cast upon him by his marriage, which he has a right to reject, by refusing to perform the condition. The decedent, Philip C. Donnelly, in the most solemn mode known to the law, by deed duly executed, not only declared that his wife's estate should remain sacred to her own use, that he would not exercise a right which his marriage to her gave to him, but he went further, and transferred that right to a third person, in trust for the use of his wife and children, by which he not only concluded himself, but all persons claiming or entitled to claim under him. If the execution of the deed to Traynor had followed, instead of preceding the assignment for the benefit of creditors, the conveyance of the 17th of December 1831, would have passed no title to Traynor, because the right to reduce his wife's choses in action to possession would have passed to his assignees; but having been perfected one week before the assignment, no portion of the wife's estate, not at that time converted to his own use, was in any way affected by it.

" These views are, we think, well grounded upon principle, and supported by English and American decisions, a number of which are found in the reports of our own state: Dennison *v.* Nigh, 2 *Watts* 90; and Robinson *v.* Woelpper, 1 *Wh.* 179; deciding that a wife's outstanding legacy cannot be attached for the husband's debt, because the husband had no property in it, are authorities in point. So also are the cases of Bouslaugh *v.* Bouslaugh, 17 *S. & R.* 361; and Smethurst *v.* Thurston, *Brightly's Rep.* 127. See also the recent cases of Nolens' Appeal, 11 *Harris* 37, and Gochenauer's Estate, 11 *Harris* 460.

" By the receipt of Philip C. Donnelly, dated the 9th of December 1839, and the testimony of Joseph T. Snyder, it appears that $500, one-half of the bond due by the trustees of St. Mary's Church, was paid to the decedent; how does the receipt of the money in 1839, by the husband of the accountant, affect the question, as to whether the $500 is to be treated as the property of the husband or as that of the wife ?  In no way, that we can see ; for the deed of trust was irrevocable by Donnelly ; to the trustee he was bound to account; and without his authority the payment by the church was a payment in their own wrong.   Greenfield's Estate, 2 *Harris* 489, settles this question conclusively.   Donnelly had no more right, as the husband of his wife, to receive or meddle with her property derived from her father, than the most entire stranger ; for having parted with that right, it was gone beyond recall.   This view of the question, raised by the fourth exception, disposes of it in favour of the accountant.

" The second exception brings up the most important issue in this case, for both the accountant and the excepting creditor. The inventory and appraisement filed by the administratrix amounted to $2551.50.   This was principally invested in carrying on the pawnbroking business by the decedent at the time of his decease, which business was continued by the administratrix with the funds of the estate, from which she realized large profits, and the auditor has surcharged her with the sum of $13,477.77 as the net gain of the business for the period of twelve years 'and three months.   This surcharge the auditor has made at the instance of Allin Robinett, who was one of the firm of Robinett, Pollard & Co., creditors of Philip C. Donnelly, which firm executed a release of their claim against him on the 31st day of December 1831. On the 25th of December 1835, the said firm brought suit on their original cause of action, alleging that the release had been improperly obtained, and on the 2d day of June 1848, recovered a verdict against the estate of Philip C. Donnelly for $6401.

" The auditor is of the opinion, that as it has been judicially established, that the whole .of the estate which came into Mrs. Donnelly's hands was properly applicable to the payment of this claim, and she having retained the funds in her possession, with which she continued the business of her deceased husband, the profits made with the money of the estate belong to the creditors thereof, for whom she must be considered a trustee, and to whom she will be required to account.

" The principle is well settled, that one who acts as a trustee, acts for the benefit of those represented by him, and that the gain made in that capacity must enure to their benefit ; but it is subject to many modifications, and is varied as to the extent of its application and enforcement by the circumstances of each case.   There are several classes of cases in which a trustee is punished by hold-  .

ing him to the strictest degree of accountability, as where the express terms of the instrument creating the trust have been violated, or where trust securities are converted to the individual use of the trustee, or where a trustee has been guilty of gross fraud, actual misfeasance, or wrong.   One acting in a fiduciary capacity will also be required to account for the natural and direct increase of trust-money, the immediate gain of an investment of funds belonging to others.   Neither will one be allowed to profit by an act which, in good faith, ought to have been done for the *cestuis que trust*.   In this case the auditor has, we think, given to the principle a more extended application than has heretofore been allowed to it, by charging the administratrix, not with the natural increase of the fund alone, but with the profits resulting from the time, labour, and skill which she brought to bear in the management of the business, from which the large amount of gain with which she has been surcharged, was realized.

"In the case of Raphael *v.* Boehm, not reported, but referred to in Tebbs *v.* Carpenter, 1 *Madd.* 300, interest was compounded upon the trustee with half-yearly rests, because the trust fund which had been directed to be laid out for accumulation, had been used by the trustee in his own private business; but even in that case, the principle adopted and acted upon by the auditor was expressly repudiated by Lord Loughborough, who made the decree; for he says, a case of very plausible aspect had been put, with the view of deterring the court from taking the course which all principle points out; the instance cited was an apothecary, buying drugs with £100 of trust-money, and earning £1000 a year by selling them to his patients; so, he says, a case might be taken of trust-money laid out in the purchase of steel, or silk, which, when worked into goods of the finest fabric, the work exceeds by ten thousand times the value of the material; but he says such instances prove nothing, for they are cases not of profit upon stocks; and he might have added, not of the natural increase of trust funds in any way invested, *but of skilful labour very highly paid; and no reasonable person would ever dream of charging a trustee, whose skill thus bestowed has so enormously augmented the value of the capital, as if he had only obtained from it a profit.*

"The testimony taken in this case shows, that the business carried on by the accountant, is only largely profitable when conducted by a person who is diligent and skilful in its management; and that when conducted with no more than ordinary diligence and skill, but little gain can be realized from it.   To suppose, that a business left to itself, upon an investment of the small amount of capital employed by the accountant, would realize some $21,000 of gross profits, during the time she was engaged in carrying it on, is to suppose an impossibility.   The necessary inference then is, and it is supported by the testimony appended

to the report, that the profits made were the direct and immediate result of the skill and labour of the accountant, applied continuously, for upwards of twelve years, which the auditor has decided belong not to Mrs. Donnelly, but to the creditors of her deceased husband. We know of no case to justify the conclusion at which the auditor has arrived; for to give to the creditor or creditors of this estate all that has been allowed to them, would be to place them in a better situation than they would occupy if the fund had been invested for their benefit, or even compounded by the accountant, and that too when there is no evidence of fraud on her part. In Dietterich *v.* Heft, 5 *Barr* 87, it is distinctly decided, that for mere omissions or negligence, the rule in Pennsylvania *is simple interest and no more;* and in the matter of Harland's Accounts, 5 *Rawle* 323, although malfeasance was imputed to the guardian, and the court below had decreed triennial rests, yet the Supreme Court imposed but simple interest on the accountant.

" It does not appear from anything before us, that the administratrix has attempted in any way to evade her liability for the property which came into her hands; neither do we think her conduct as administratrix open to grave censure or reproach, when the circumstances as they transpired are borne in mind. The suit of Robinett, Pollard & Co. was not brought until after four years delay, six years were then allowed to elapse before they filed their *narr.*, which was only about two months before the decease of Philip C. Donnelly; after upwards of four years additional delay, the accountant was first made a party to the proceedings, and two years afterwards the case was brought to trial.

" Now in what relation did the administratrix stand to Robinett, Pollard & Co. ? She found that during ten years prior to her husband's death, they had rested content with simply bringing suit and filing a *narr.*, from which she certainly had a right to argue no great confidence on their part in the claim which it was her duty to resist for the benefit of her children, whom she knew to be her *cestuis que trust*, if Robinett & Co. were not. But from the fact that for four years after it was known the estate was in her hands, no attempt was made to make good any demand against it, the accountant, during this period, could regard herself as acting only for those who stood behind an alleged creditor who took no steps to prove his claim.

" From all the facts of this case, as presented by the auditor in his report, we are of opinion, that the claim of Robinett, Pollard & Co. can be regarded in no other light than as a debt due to them by the estate, which they are entitled to have paid, with simple interest, so far as the property of the estate, less the legal deductions, which went into the hands of the administratrix, and interest on said balance, will suffice for that purpose. The second exception is therefore sustained.

" The fifth exception having relation to the disallowance of commissions to the accountant, for the reasons already stated, is sustained. Commissions ought to be allowed to her."

The report having been referred back to the auditor, he restated the account in conformity to the opinion of the court, and allowed her the additional expenses incurred, amounting to $490.01. Robinett excepted to this amended report, but his exceptions were overruled by the court, the account confirmed, and distribution decreed accordingly. By this amended report, there was awarded to Allin Robinett the sum of $3671.72, on account of his claim against the estate. From this decree, the present appeal was taken.

*G. W. Biddle* and *McMurtrie*, for the appellant.—Two settled principles of law have, it is submitted, been violated by the court below—1. A premium on a breach of trust has been awarded, and that to an amount far exceeding the original assets. 2. A trustee has been permitted to make an enormous profit out of, and at the hazard of the estate. No authority can be produced where these rules are alluded to but for affirmation as axioms.

These rules are well established, and, to sustain them, three sufficient reasons may be given, viz. :—1. To deter men from committing such breaches of trust, by the inflexible rule that all losses must be borne by themselves, and all gain accrue to the *cestuis que trust*. 2. As a penalty for a known violation of duty, which is always attended with hazard. 3. Because universal usage and plain equity dictate that the owner of property is entitled to the product thereof.

It is believed, no instance can be found, in which trust funds employed as these have been, where the *cestui que trust*, at his own election, has not been entitled to take the profits as such. In any business where, by usage, capital alone is deemed equal to labour and skill in conducting it—if there were no breach of trust, it would be assumed that such was the intention of the parties—but it may be doubted whether it would be safe, even to this extent, to sanction the violation of the duty of a trustee, by putting him on the same footing as if he had bargained for his capital. The contrary has been uniformly held, where partnership assets have been employed in the business by the surviving partners. Invariably, they have been required to account for the *pro rata* of the profits, with no allowance for the value of the services of the deceased partner : Brown *v.* De Tastet, *Jac.* 284 ; 4 *Russ.* 126.

The court below put the trustee, however, on a far better footing than she would have been, had she borrowed from a stranger. Can it possibly be supposed, that capital for trade without security, would be loaned at the rate of mortgage investments ? And even then, semi-annual payments of interest would have been required.

[Robinett's Appeal. Donnelly's Estate.]

Unless, therefore, the court are prepared to put this breach of trust on a better footing than a loan, and really give a premium to such acts, it seems to be impossible to sustain the decree below. The auditor did not charge the trustee with gross profits, nor even with profits strictly. He allowed liberally for the services of the trustee, and charged but the surplus of profits.

If, however, it should be thought this was going too far, there are but three standards that suggest themselves:—1. To ascertain what is, in such trade, deemed proper proportions for capital and labour, where one partner contributes capital only, and the other services only. This is putting the trustee on as good a footing as she could have been, had she bargained for the capital with a stranger. 2. To allow rests at such times as by the usages of business interest is paid on loans, and the lenders can reinvest their profits. 3. The plan adopted by the court. Which, if sanctioned, will turn every trustee, not influenced by other than legal motives, into a trader with the trust fund.

They cited to this point, Docker v. Somes, 2 *Mylne & Keen* 655; Palmer v. Mitchell, in note to *Id.*; Dietterich v. Heft, 5 *Barr* 89; Harland's Accounts, 5 *Rawle* 323, 333; Lukens's Appeal, 7 *W. & S.* 48; 2 *Kent's Com.* 230–1; Oliver v. Piatt, 3 *How.* 401; Johnson v. Richey, 4 *How.* (*Miss.*) 233; Utica Ins. Co. v. Lynch, 11 *Paige* 524; Robinson v. Robinson, 9 *Eng. L. & Eq.* 70, 75, 77; Williams v. Powell, 10 *Id.* 233; Jones v. Foxall, 13 *Id.* 142–3; Knott v. Cottee, 13 *Id.* 304; *Hill on Trustees* 534, 766; Ex parte Cassel, 3 *Watts* 443; Beck v. Uhrich, 4 *Harris* 499.

*Meredith* and *B. H. Brewster*, for the appellee.—It is a well-settled principle of law, that the person who acts as trustee acts for the benefit of those whom he represents, and that the gain made by him in that capacity, must enure to their benefit; yet this principle is necessarily subject to many modifications, and circumscribed in its generality by the particular circumstances of each case. If it were not so limited, it might extend indefinitely into the grossest injustice.

The classes of cases in which a trustee is punished by being held to the strictest responsibility are:—

1. Where the trustee has made use of the trust funds, in manifest and direct violation of the express terms of the instrument creating the trust.

2. Where the trustee has reduced funds of the estate, that were invested in paying securities, and made use of them in his own trade, rendering them worthless to the estate.

3. Where the trustee has "conducted himself fraudulently in the trust, has been guilty of gross fraud," has "refused to account," or has otherwise been guilty of actual misfeasance or wrong.

4. Where the profit made has been one of a direct nature, easily traceable, and due to the natural increase on the trust fund —as where one, acting as trustee, purchases land with the money of the trust, and the land increases in value, and is sold at a profit by the trustee. Or, where the profit is caused by the trustee purchasing mortgages or other securities at a discount, and asking credit of the estate for the nominal value. Or, where one pays a debt, owing by the estate to a bank, by buying up the notes of the bank at a discount, and compelling the bank to take them at their value, and then asking credit of the estate for the whole amount of the debt. Or, where the profit realized is from successful speculations in stock with the money of the trust, or from a successful commercial speculation, *which involve little or no labour upon the part of the trustee, and are due almost altogether to the presence of the money*, which belonged to the *cestui que trust*, and to whom the profit should go.

The result arrived at by these distinctions has been most just and logical.

In the first three instances, the trustee having been guilty of some transgression of the instructions under which he acts, some injury to the estate by which his *cestui que trust* suffers, or some fraud, wrong, or misfeasance, a heavier rate of interest, compound interest, and even profits, have been allowed as a punishment.

In the last instances named, where the profit is from the natural increase on the trust money, as in purchases of land or bank stock, or from successful speculations, the profit is awarded to the *cestui que trust*, because it is the direct and indisputable product of the money itself, or if there is any labour given to it by the trustee, it is entirely counterbalanced by the preponderance of the funds. Thus, in the purchase of land or of stock, both familiar instances, there is required very little labour, a small amount of thought, and the consumption of but a short space of time; the money once invested does the rest, and does it in a way which no labour, thought, or time could effect without it. Here, therefore, the natural effect of the money is as ten to one to the labour employed upon it. But, in the reverse case, where, under mistake, omission, or negligence, a small capital is used, and, upon that capital, industry, and intelligence proceed to erect, during a long course of years, a superstructure of wealth; the toil, the skill, the tact, the attention, the time on the part of the labourer are as ten to one to the natural effect of the money; and, in that case, we cannot, arguing back from consequences to cause, ascribe all these results to that little portion of money held by the trustee at first.

It will be found, upon an examination of all the cases in which the doctrine of profits prevails, that the circumstances of each bring it within the scope of some one of the above classes; that

the doctrine has always been reluctantly applied, and never except as a punishment for gross fraud or corruption.

It will be seen, too, that even in extreme cases of misconduct on the part of persons acting in a fiduciary capacity, where the application of this doctrine of profits would not be inconsistent with the principles which are said to justify it, judges have preferred to commute the punishment by inflicting compound interest, rather than resort to this harsh and severe extremity.

They cited to this point, Voorhees *v.* Stoothoff, 6 *Halst.* 148; Docker *v.* Somes, 2 *Mylne & Keen* 662; Harland's Accounts, 5 *Rawle* 332; Dyott's Estate, 2 *W. & S.* 557; *Hill on Trustees* 548, 787; Ratcliffe *v.* Graves, 1 *Vern.* 197; Kildare *v.* Hopson, 4 *Bro. Cas. Parl.* 550; Gregory *v.* Harman, 3 *C. & P.* 207; Hicks *v.* Hicks, 3 *Atk.* 274; Mousley *v.* Carr, 4 *Beav.* 49; Knott *v.* Cottee, 16 *Id.* 80; Williams *v.* Powell, 10 *Eng. L. & Eq.* 225; 13 *Id.* 311; Acherman *v.* Emott, 4 *Barb. S. C.* 649; Rowan *v.* Kirkpatrick, 14 *Illinois* 2; Swindall *v.* Swindall, 8 *Iredell Eq.* 285; Tebbs *v.* Carpenter, 1 *Madd.* 290; State *v.* Mayhew, 4 *Halst.* 70; Gwynn *v.* Dorsey, 4 *Gill & Johns.* 453; Boynton *v.* Dyer, 18 *Pick.* 1; Comegys *v.* The State, 10 *Gill & Johns.* 175; In re Dyott, 2 *W. & S.* 557; Jacot *v.* Emmett, 11 *Paige* 142; Robbins *v.* Hayward, 1 *Pick.* 528; Ringgold *v.* Ringgold, 1 *Har. & Gill* 11; Winder *v.* Diffenderffer, 2 *Bland* 166; Clarkson *v.* Depeyster, *Hopk.* 424; Handley *v.* Snodgrass, 9 *Leigh* 484; Myers *v.* Myers, 1 *Bailey Ch.* 23; Latimer *v.* Hanson, 1 *Bland* 51; Woodhead *v.* Marriott, *C. P. Cooper* 62; *Spence's Eq. Jur.* § 9212; Raphael *v.* Boehm, 11 *Ves.* 104; Kers' Administrator *v.* Snead, 11 *Law Reporter* 217; Schieffelin *v.* Stewart, 1 *Johns. Ch.* 620; *Lewin on Trusts* 327; Piety *v.* Stace, 4 *Ves. Jr.* 620; Stackpoole *v.* Stackpoole, 4 *Dow* 209, 469; Turney *v.* Wilson, 7 *Yerg.* 340; *Domat,* § 1982; Whatton *v.* Toone, 5 *Madd.* 54; Hall *v.* Hallett, 1 *Cox* 134; Sherwood *v.* Wooster, 11 *Paige* 441; Bryant *v.* Craig, 12 *Ala.* 354; In re Thorp, *Daveis* 290; Johnson *v.* Lewis, 2 *Strob. Eq.* 157; Clay *v.* Hart, 7 *Dana* 1; Crooks *v.* Turpen, 1 *B. Mon.* 183; Rapalje *v.* Norsworthy, 1 *Sandf. Ch.* 399; Minuse *v.* Cox, 5 *Johns. Ch.* 441; Mumford *v.* Murray, 6 *Id.* 1; Miller *v.* Beverley, 4 *Hen. & M.* 415; Dunscomb *v.* Dunscomb, 1 *Johns. Ch.* 508; Manning *v.* Manning, *Id.* 527; Garnis *v.* Gardiner, 1 *Edw. Ch.* 128; Fitzgerald *v.* Jones, 1 *Munf.* 150; McKenzie *v.* Smith, 2 *Murph.* 92; Ryves *v.* Coleman, 2 *Atk.* 439; Bruere *v.* Pemberton, 12 *Ves.* 386; Rocke *v.* Hart, 11 *Id.* 58; Dietterich *v.* Heft, 5 *Barr* 87; Fox *v.* Wilcocks, 1 *Binn.* 194; Say's Executors *v.* Barnes, 4 *S. & R.* 116; Merrick's Estate, 1 *Ash.* 305; English *v.* Harvey, 2 *Rawle* 309; McCall's Estate, 1 *Ash.* 357; Light's Appeal, 12 *Harris* 180; Biles's Appeal, *Id.* 335; Witman's Appeal, 4 *Casey* 378; Mousley *v.* Carr, 4 *Beav.*

53; Norman *v.* Storer, 1 *Blatch.* 593; Wendall *v.* French, 19 *N. H.* 205.

The opinion of the court was delivered by

WOODWARD, J.—The first question that naturally arises upon this record, has reference to the $500 received by Philip Donnelly, the intestate, which came to his wife under the will of John Gavin, her father.

The auditor, considering that Donnelly had reduced this sum into possession during coverture, treated it as part of his estate, which, at his death, went into his wife's hands, as his administratrix, and for which, therefore, she should be held to account.

The Orphans' Court reversed the auditor, on the ground that Donnelly had, on the 10th of December 1831, executed a deed to Thomas Traynor for all his interest in his wife's property, in trust for her separate use and that of her children. The court regarded the deed as a renunciation of the husband's right to reduce this *chose* into possession, and treated his actual receipt of it, subsequently, as illegal and void. The soundness of this ruling is the first point to be considered.

That Donnelly actually received this sum from his wife's estate is past all doubt. There are his receipt of 9th December 1839 for $300 of it, and the report of Joseph A. Clay, as auditor of the account of Gavin's executor, finding that the whole sum of $500 had been paid to Donnelly. The audit of Gavin's estate took place in 1849, after Donnelly's death, and Mrs. Donnelly contested the executor's right to a credit for the payment of the money to her husband. The Traynor deed of 10th of December 1831, if of any validity, was in full operation at that time, and Mrs. Donnelly was represented before Mr. Auditor Clay by counsel; yet the decision was against her, and was acquiesced in. It was held to be good payment by Gavin's executor to Donnelly, and the credit was allowed. Now what was this but a legal adjudication of the fact again drawn in question here?

As the law of the marriage relation stood in 1839, Donnelly had a right to receive his wife's chose in action, but if he had renounced that right by a valid instrument, eight years before, the payment to him was what the court considered it, illegal and void. On this hypothesis, Gavin's executor paid it in his own wrong, and should not have had the credit claimed. Yet the law in 1849 adjudged the payment valid. From that decree no appeal was taken, and it is not to be reversed collaterally. If the decision of the court, now under review, were permitted to stand, we should have on record two inconsistent decrees in respect to this fund: one, that it was well paid to Donnelly; the other, that

he had no more right to receive or meddle with her property derived from her father than the most entire stranger.

From the facts that Mr. Auditor Perkins places before us upon the present record, it is easy to infer why Mr. Clay gave no effect to the Traynor deed of settlement in 1849. It appears, that when Donnelly made that settlement in 1831, he was largely indebted, and that the debt of Robinett, Pollard & Co., which is the subject of the present controversy, was in existence at that time.  Just a week after the date of the deed to Traynor, Donnelly made an assignment of his own property for the benefit of his creditors, stipulating for releases on their part.   Robinett, Pollard & Co. released and came in under the assignment, but discovering afterwards that the assignment was fraudulent, they instituted suit against Donnelly on their original claim.   This suit was commenced 25th September 1835, in the District Court, and, though not tried until 1848, resulted in favour of the plaintiffs, and thus overthrew the assignment as fraudulent.   The deed to Traynor, acknowledged the day of its date, was not recorded till the 5th of October 1835, almost four years after it was made, and ten days after the suit of Robinett, Pollard & Co. had been commenced.

These facts, in the absence of all proof that the deed of settlement was ever delivered to Traynor, or that he acted under it, doubtless, led Mr. Clay, in 1849, as they did Mr. Perkins, in 1854, to set it aside as fraudulent and void.   Mr. Perkins had, moreover, the additional fact, sworn to by Mrs. Donnelly herself, that there was no settlement.

We think he had abundant ground for disregarding that deed. We are not prepared to say, that this chose of the wife would not have passed under the deed of assignment, had it been fair and valid; for we have not been furnished with a copy of the assignment, and under our decisions, which are hard to reconcile on the point, the terms of the instrument would need to be looked at; but surely it is competent for creditors to question a post-nuptial settlement, made by a man deeply indebted and on the eve of a bankruptcy, judicially ascertained to have been fraudulent; and that, too, when the only purpose of setting up the settlement is, to prove that money actually received by the husband from the wife's estate was not reduced into his possession.   The creditors have to look to his estate for satisfaction, and if in law and fact, this money became a part of his estate, they have a right to follow it. But he did reduce it to possession, and it consequently became a part of his estate, unless the settlement of 1831 was valid.   Two very competent auditors have found that it was not valid ; the wife herself swears there was no settlement ; the circumstances attending it are of the most condemning character, and yet the court below held it sufficient to balk the pursuit of creditors.   Before the auditor, Mrs. Donnelly seems not to have put her claim to the

money on that deed at all.    On the contrary, she swore that she kept the money, that her husband did not handle it, and that her guardian (by whom I understand her to mean her trustee) was dead at the time.    We have not seen the deed, and do not know whether the trusts in it survived the trustee or not; but it is very singular, that whilst the money is denied to the creditor and given to the wife, by virtue of that deed, she claimed it on the ground not of the deed, but of her personal custody and handling of it.

If it were an honest settlement of the wife's separate estate— if, indeed, it were not like the deed of assignment, a contrivance to cloak the property from the scrutiny of creditors, why was it not delivered and recorded like other nuptial settlements?    And why were not the $500 paid to the trustee, or to his successor? Why, in a word, did the wife rest her claim to the money on the sole ground that her husband permitted her to handle it?

We entirely agree with the learned judge, that the husband might renounce his marital rights in favour of a trustee, but it must be a *bonâ fide* act of renunciation.    A settlement, never recognised nor acted on, but disregarded by all the parties in interest, was no settlement—was a sham transaction.

We have many cases in our books in which the wife's right of survivorship in her choses in action was sustained, on the ground of the husband's contemporaneous acts and declarations, importing that he did not mean conversion of her choses, to be reduction into possession; but this case, unaccompanied by any such acts and declarations, stands where the court placed it, on the deed of settlement.    Except that, there is nothing to indicate the husband's intention to renounce his marital rights, and considering how clearly circumstances prove that to have been part of the scheme to defraud creditors, it ought not to prevail.

What is conclusive on the point, is the fact, that the auditor found it to be fraudulent and void, on grounds that are entirely satisfactory to us.

The next question upon the record is, whether the auditor erred in surcharging the administration account with the profits made by the administratrix out of her husband's estate.    He was a pawnbroker, and she continued the business after his death, and made large profits.

The auditor took the lowest amount of annual profits to which she testified, and deducting from them $600 per annum for her reasonable expenses, charged her with the balance, equal to $1100 per annum, as the net profits of the business.

As administratrix, she was the trustee, first of creditors, and next of heirs, and the law pointed out very plainly her duties. When, instead of walking in the prescribed path, and bringing the estate to a speedy and final settlement, she undertook to trade with it, she made herself liable to account to the *cestuis que trust*,

on those principles which are ordinarily applied to trustees for breach of trust and malversation of funds.

The general rule of equity, as stated by Judge Story, in Oliver *v.* Piatt, 3 *Howard* 333, is, that the gain made by the trustee by a wrongful application of the trust-fund, shall go to the *cestui que trust,* and all the losses shall be borne by the trustee. This principle was substantially recognised and applied in Callaghan *v.* Hall, 1 *S. & R.* 241; Wiley's Appeal, 8 *W. & S.* 244; and in Emeret's Estate, 2 *Parsons's Eq. Cas.* 195. ·

As the trustee is to be charged with so much of the profits only as are fairly attributable to the trust-capital, it is manifest, that it must often be very difficult to ascertain these correctly. If the trust-moneys be invested in lands or stocks, which appreciate by mere lapse of time, a chancellor would have no difficulty in measuring the extent of the trustee's liability; but if they be mixed with the trustee's own capital, and be employed in trade or business which requires skill and industry on his part, it is hard to say how much of the profits are due to the trust-fund, and how much to the trustee.

The particular inconvenience of going into complicated accounts, for the purpose of separating the profits produced by the trader's own capital or skill, from those that the trust-fund had earned, was strongly urged upon Lord Brougham, in 1834, in the case of Docker *v.* Somes, 2 *Mylne & Keen* 655. It was said in the argument of that case, that Brown *v.* De Tastet, 4 *Russ.* 126, was the only case in which such an investigation had been attempted, and that there it was eventually abandoned. It was insisted, that the rule had become firmly established, that whenever a trustee, who is in trade, mixes and uses trust-moneys in his business, he shall be charged with interest, the rate whereof, not exceeding five per centum per annum, is to be governed by all the circumstances of the case. But after reviewing all the cases, and discussing with great animation, the alleged difficulties of the investigation, his lordship concluded, that if a trustee mixes trust-funds with his private moneys, and employs both in trade or adventure of his own, the *cestui que trust* may, if he prefers it, insist on having a proportionable share of the profits, instead of interest on the amount of trust-funds so employed.

In Robinson *v.* Robinson, 9 *Eng. Law & Eq. R.* 75, the same rule was not only recognised, but the *rationale* of it brought out in terms as follows: "The employment in trade is unwarrantable, but if it turns out to be profitable, the *cestui que trust,* in such a case, has a right to follow the money that is used in trade and profit, because in such a case the trade profits have in fact been produced by the employment of the money of the *cestui que trust;* and it would be manifestly unjust, to permit the trustee to rely on

his own misconduct, in having exposed the fund to risks of trade, as a reason for retaining the extra profits beyond interest, for his own benefit.   Even where no such extra profits have been made, the *cestui que trust* is, in general, at liberty to charge the trustee who has allowed the trust-money to be employed in trade, with interest at five per cent., that being the ordinary rate of interest paid on capital in trade.   This right depends on principles the same, or nearly the same, as those which enable the *cestui que trust* to adopt the investment, and take the profits actually made.''   This decision was pronounced in 1852, and may be regarded as expressing the final conclusions of the English Chancery on this interesting question.   Where profits are made, and the *cestui que trust* claims them, they are to be ascertained, notwithstanding the difficulties of the investigation.   And if hardship occasionally happen from an application of the rule, the wrongdoer will have no right to complain.   If he dread the application of the rule, the better for the trust, for he will be more likely to administer it according to law.

Shall this rule be adopted in Pennsylania ?   We are referred to a great number of our own cases that are supposed to be inconsistent with it, but they have reference to the rate of interest with which trustees should be charged for non-employment of trust-funds, or for use of them where there has been no malversation. These cases show that we have rejected triennial rests in computations of interest, and come down to the legal standard of six per cent. in settling with trustees, but they were cases in which profits were not made, or if made, were not claimed : Dietterich *v.* Heft, 12 *Barr* 87, and the cases therein cited; Light's Appeal, 12 *Harris* 180 ; Biles's Appeal, *Id.* 335.

They are not inconsistent with the English rule, nor applicable to a case like this, where the profits *are* claimed, and have been carefully, and, we have no doubt, correctly ascertained.   We think that every reason that has been urged in behalf of the rule elsewhere, is applicable in Pennsylvania, and that the machinery of our courts is as well calculated for its prudent application, as is that of the English Chancery.

We approve, therefore, of the auditor's procedure in this part of the case.   The Orphans' Court thought he did not make due allowance to the administratrix for her skill and industry, but we see no evidence of mistake in this regard.   He meant to charge her with that proportion only of the profits which were fairly attributable to the trust-funds; and as there was nothing before the court to show that he erred in matter of fact or law, his report ought to have been confirmed.

It follows, as a necessary consequence, that the auditor was right in denying the accountant commissions.   Besides the trading with the estate, there was some evidence of attempts to fabricate

spurious debts against the estate, and to misapply funds. An unfaithful trustee is not to receive the rewards of a faithful one.

The allowance of counsel fees and the expenses of the audit were, under the circumstances of the case, all that the administratrix had a right to claim, and these, though excepted to, we are not disposed to strike out.

Nor do we see any error in the court's dismissing the first exception of Mr. Robinett. According to a strict construction of the English rule, interest as well as profits might perhaps have been claimed, but that would have been interest on the capital, not on the profits. The auditor and court concurred in refusing interest on the profits, and we think they were right.

The result which we reach is, that of the seven errors assigned by the appellant, the 1st, 3d, and 5th are sustained, and the rest are not.

> And now, to wit, 11th of May 1859, this cause having been argued by counsel, and considered by the court, it is ordered and decreed that so much of the decree of the Orphans' Court as reversed the first report of the auditor as to his surcharge of the account with the $500, received from the estate of John Gavin, and with the profits of the business carried on by the accountant with the funds of the estate of her deceased husband, and allowed her commissions, be and the same is hereby reversed, and the report of the auditor in these particulars is confirmed; and as to the residue of said decree, the same is affirmed, and the record is remanded to the Orphans' Court, to be proceeded in according to law; the costs of the appeal to be paid by the appellee.

On the application of the appellee's counsel, a re-argument was granted; and the case having been again argued by the same counsel, the following opinion was delivered by

READ, J.—An executor or administrator, in equity, is simply regarded as a trustee, and is bound to apply the property in his hands to the payment of debts and legacies, and to apply the surplus according to the will of the testator, or, in case of intestacy, according to the intestate laws. And if he undertakes to carry on the trade of the deceased, he is chargeable with all the profits. "For, if the trade is beneficial, the profits are applicable to the purposes of the trust, and the executor or administrator derives no personal benefit from the success:" 2 *Williams on Executors*, 5th ed. 1624–5. "And the rule is now *universal*, that, whether the executor was solvent or insolvent, whether the money was part

of the general assets, or specifically bequeathed, whether lent upon security, or employed in the way of trade, the executor shall account for the utmost actual profits to the testator's estate:" *Lewin on Trusts* 360–1.

These rules, thus laid down by the ablest text writers of the day, are supported by the latest and best authorities, some of which it is proposed briefly to notice.   In Palmer *v.* Mitchell, before Sir WILLIAM GRANT, where it was charged in the bill, that the defend-ant, one of the executors, continued to carry on the business in which the testator had been engaged, and that he had retained large balances of the testator in his hands, which he had invested in the trade, or in other mercantile concerns or speculations, an account was decreed on the 8th December 1809, " to be taken of what balances were, from time to time, in the hands of the execu-tors, or either of them; and it was declared, that they ought to be charged with the profits and advantages made by them of the per-sonal estate of the testator, whilst the same or any part thereof was employed by them, in any trade or business, since the testa-tor's decease :" 8 *English Chancery Reports* 180–1, in note.   In Freeman *v.* Fairlee, 3 *Merivale* 25, a case which had been discussed at length before Sir WILLIAM GRANT and Lord ELDON, the former made a decree on the hearing of the cause, dated the 17th of March 1813, by which it was referred to the master to take the usual accounts, and to inquire what interest or profit had been made of the personal estate of the testatrix, it having been used in trade.   The whole question was discussed and decided by Lord Chancellor BROUGHAM in 1834, in Docker *v.* Somes, 2 *Mylne & Keene* 655, a case which has been confirmed and followed in very late cases.

In Jones *v.* Foxall, 21 *Law Journal Rep.* (*N. S.*) *Ch.* 725, the present Master of the Rolls said,—" If, in addition to this, he has employed the money so obtained by him in trade or speculation, for his own benefit and advantage, he will be charged, either with the profits actually obtained by him from the use of the money, or with interest at five per cent. per annum, and also in the yearly rests, that is, with compound interest.   The principle on which the court charges an executor with profits which have actually arisen from the property of the *cestuis que trust* employed by him, is obvious, and of general application, when such profits are found to have been made.   It was the money of the *cestuis que trust*, and they are entitled to receive the profits that are earned."

In McDonald *v.* Richardson, 5 *Jurist* (*N. S.*) 9, V. C. STUART, after reviewing the cases of Freeman *v.* Fairlee, Docker *v.* Somes, and Palmer *v.* Mitchell, says,—" Where an executor employs assets in carrying on trade, without any authority, he is bound to account for and pay over all the profits, or he may be charged

[Robinett's Appeal. Donnelly's Estate.]

with interest, at the option of those beneficially entitled to the assets misemployed. This is a right personal against the executor." The same doctrine is applied by the same learned judge, in the same way, in the case of Townend v. Townend, *Id.* 506, and a similar rule as to the profits derived by a trustee *ex maleficio*, was applied to a member of a corporation, in relation to the purchase of their debentures, in the case of Bowes v. City of Toronto, 11 *Moore P. C. C.* 463.

It is clear, therefore, that the general rule laid down by my Brother WOODWARD is not only sound law, but the undoubted law of this state, and is founded in common sense, common honesty, and common justice.

This decides the real question in this case, and upon a careful examination of the opinion of Justice WOODWARD, I find no reason to differ from him in any of his conclusions. This cause was argued originally with great force, and every care was bestowed by both sides on the argument upon the rehearing; but seeing no reason to change the decree already made, it must stand as the final judgment of this court.

Decree affirmed.